Argued June 30, reversed November 10, 1925, rehearing denied January 5, 1926.

# ANTHONY NEPPACH v. FLORENCE C. NORVAL

## ET AL.

### (240 Pac. 883; 242 Pac. 605.)

**Trusts — To Establish Resulting Trust in Land Purchased by Husband and Recorded in Wife's Name, There must be Satisfactory Evidence That Such was Intention of Parties.**

1. To establish resulting trust in property purchased by husband and recorded in wife's name, there must be satisfactory testimony indicating intention on part of purchaser that grantee shall hold property in trust, and like intention on part of grantee to so hold, and it should be established by clear and satisfactory testimony, yet not necessarily such as to leave question free from any reasonable doubt.

**Trusts — Prima Facie Presumption That Property Bought by Husband and Placed in Name of Wife is Intended as Advancement.**

2. Where husband buys property and takes title in name of wife, *prima facie* presumption is that such purchase was intended as an advancement, and burden of proof is on husband to overcome that presumption by satisfactory evidence that such was not the intention of parties.

**Trusts—Evidence Held Sufficient to Show Purchase of Property by Husband With Intention of Parties That Resulting Trust Should Obtain.**

3. In action by husband to establish resulting trust in property alleged to have been purchased by him and title taken in name of wife, evidence *held* sufficient to establish fact of purchase of property by husband, and to overcome presumption that such purchase was intended as advancement.

### ON PETITION FOR REHEARING.

4. "Express trust" is one created by contract of parties intentionally and in writing, and every other trust is either constructive or resulting.

---

1. Resulting trust as arising in favor of either husband or wife, see note in 127 Am. St. Rep. 252.

Resulting trust as arising from husband's purchase of property in wife's name, see notes in Ann. Cas. 1915C, 1082, 1097, 1102; Ann. Cas. 1917B, 225. See, also, 26 R. C. L. 1231.

2. See 26 R. C. L. 1225, 1226.

Trusts—Agreement or Understanding Between Parties will not Absolutely Destroy Resulting Trust, if It Would be Fraud on Cestui Que Trust to Allow Grantee of Legal Title to Retain Possession.

5. Agreement or understanding between parties will not absolutely destroy resulting trust, if equity can say that it would be fraud on *cestui que trust* to allow grantee of legal title to retain possession of property.

Trusts—Evidence of Agreement of Parties to Transaction Held Admissible to Show That Party Paying Money was to be Ultimate Owner of Property.

6. In suit to establish resulting trust, evidence of agreement of parties and of all circumstances of case is admissible to show that party paying money was to be ultimate owner of property, and that grantee in deed was merely intermediary.

Trusts — Proof of Parol Trust, Unenforceable Under Statute of Frauds, Held not to Prevent Resulting Trust.

7. Proof of parol trust, unenforceable because of statute of frauds, will not prevent trust from resulting, unless agreement relating thereto has effect of showing that intention of purchaser of property was that beneficial interest should pass to grantee of legal title, and fact that enforcement of resulting trust amounts to substantially same as enforcing express parol trust, void under statute of frauds, is no objection.

Trusts — Evidence Held to Corroborate Statement of One Claiming Trust That He Paid Money for Property.

8. In suit by husband to establish resulting trust in land purchased by him and recorded in wife's name, evidence *held* sufficient to corroborate statement of plaintiff that he paid money for land.

Trusts — Wife as Grantee of Legal Title of Land for Which Husband and Another Paid Purchase Price Holds Legal Title in Trust.

9. Where wife was grantee of legal title of land purchased with money furnished by her husband and another, she was in equity holder of title for her husband and such other person, in view of evidence that such was intention of parties in making transaction; such purchasers in equity being tenants in common and grantee of legal title their common trustee.

Trusts—Husband Entitled to Resulting Trust in Property for Which He Paid Money.

10. In suit by husband to establish resulting trust in property purchased by him and recorded in name of wife, where affirmative evidence showed that he purchased property with his own money and with intention, known to wife, to spend large amount in building home thereon, and did so, he was entitled to establish resulting trust therein, in view of fact that under will of wife he was left only life estate in such property.

**Trusts — Devisee of Remainder in Legal Title Held not to Occupy Position of Innocent Purchaser for Value.**

11.  Devisee of remainder after life estate devised to husband of testatrix did not hold position of innocent purchaser for value in suit by testator's husband to establish resulting trust in his favor in land so devised.

**Wills—Devisee Held to Take Estate Subject to All Equities, Latent or Patent, Which Existed Between Holder of Legal Title and Person Who Paid Purchase Money.**

12.  Devisee takes estate subject to all equities, latent or patent, which existed between holder of legal title and person who paid purchase money.

**Trusts — Fact That Wife, Holder of Legal Title of Property for Which Husband Paid Purchase Money, Devised It, Held not Controlling of Her Belief That Property was Hers.**

13.  In suit by husband to establish resulting trust in lands, fact that wife, holder of legal title of land for which husband paid purchase money, devised it, was not controlling, that she in good faith believed such property was hers.

**Trusts — Act of Wife, Holder of Legal Title, Ignoring Resulting Trust in Husband, Held Constructive Fraud.**

14.  Where husband purchased land and paid purchase money and took title in name of wife, any act of hers ignoring trust, regardless of motive, must be regarded as constructive fraud.

**Trusts—If Purchaser of Property Takes Title in Name of Another, Law Raises Prima Facie Presumption of Fact That Transaction was for Benefit of Purchaser.**

15.  If purchaser of property takes title in name of another, law raises *prima facie* presumption of fact that transaction was for purchaser's benefit.

**Trusts—If Purchaser of Property Takes Title in Name of Wife, Law Raises Prima Facie Presumption of Fact of His Intention to Make Gift or Advancement to Her, Which must be Overcome by Satisfactory Evidence.**

16.  If purchaser of property with his own funds takes title in name of wife, law raises *prima facie* presumption of fact that he intended to make gift or advancement to her, and, to establish resulting trust in his favor, he must overcome such presumption by satisfactory evidence.

---

16.  See 13 R. C. L. 1390.

Trusts, 39 Cyc., p. 118, n. 5, p. 136, n. 17, 22, p. 137, n. 23, p. 138, n. 29, p. 162, n. 68, p. 166, n. 89, p. 167, n. 91.

Trusts, 39 Cyc., p. 24, n. 65, 66, p. 26, n. 82, p. 44, n. 43, p. 104, n. 7, p. 106, n. 31, p. 108, n. 40, 43, p. 113, n. 67, p. 160, n. 62, p. 162, n. 68, p. 163, n. 72, p. 621, n. 53, p. 629, n. 2, p. 633, n. 19.

Wills, 40 Cyc., p. 153, n. 13, 17, p. 154, n. 19, p. 1996, n. 29, 32.

From Multnomah: J. W. HAMILTON, Judge.

Department 2.

This is a suit to declare a resulting· trust in certain lots situated in the City of Portland. Briefly stated, the complaint alleges that the plaintiff was married to Kate M. Neppach in the year 1888; that in 1908 he bought the property now in dispute, paying for it with his own money, with the understanding and agreement that the record title should be taken in the name of Kate M. Neppach to be held by her in trust for him; that he built thereon a house at an expenditure of $20,000; that he has paid the taxes upon the property from the date of the purchase until now, and that the deceased by will pretended to devise the property to the defendant, Florence C. Norval, and appointed Anna E. Norval executrix of the estate.

Defendants answered denying any trust setting up title in Kate M. Neppach and claiming title through her will to the property in question. Other matters were set up in relation to the interference by plaintiff of the administration, which are not material to the issues tried in the court below.          REVERSED.

For appellant there was a brief and oral arguments by *Mr. Guy C. H. Corliss* and *Mr. Thomas Mannix.*

For respondents there was a brief and oral argument by *Mr. James P. Stapleton.*

McBRIDE, C. J.—The principles governing a resulting trust are clearly laid down and defined, so far as this state is concerned, in *Parker* v. *Newitt,* 18 Or. 274, 276 (23 Pac. 246), in which Mr. Justice LORD said:

"The principle is well settled in equity that where one purchases an estate, and pays for it, and takes the title in the name of another, or where one purchases land with the money of another, and takes the title to himself, there arises, by operation of law, a resulting trust in favor of him whose money paid for it. 1 Perry on Trusts, § 126; Hill on Trustees, 146; *Foot* v. *Colvin,* 3 Johns. (N. Y.) 216; *Sunderland* v. *Sunderland,* 19 Iowa, 327. This is founded upon the presumption that the party paying for the estate intended it for his own benefit. But this presumption does not arise in some excepted cases, where, by reason of the relation of the parties, the payment of the consideration may be presumed to be a gift to the nominal purchaser named in the deed. 1 Perry on Trusts, § 143 et seq. Where he who pays the consideration takes the title in the name of one for whom he is bound legally and morally to provide, the presumption is that it was intended as an advancement, and not a resulting trust; or, as it is sometimes said, that this circumstance rebuts the presumption of a resulting trust, and creates a presumption that it was done as an advancement. Where land has been purchased by a husband, and the title taken by him in the name of his wife, the presumption is that it was intended as an advancement or settlement for the wife and not as a trust in favor of the husband. 2 Story Eq. Jr. 1201 et seq. Or, if a husband permits his wife to use his money to make the purchase in her own name, no trust results to the husband; but the presumption is that it was intended as an advancement, and operates the same as if he had made the purchase, and caused the title to be made to her. *Sunderland* v. *Sunderland, supra; Douglas* v. *Brice,* 4 Rich. Eq. (S. C.) 322. But this presumption may be overcome by evidence. 'Whether a purchase in the name of wife or child is an advancement or not is a question of pure intention, though presumed in the first instance to be a provision and settlement.' 1 Perry on Trusts, § 147; Hill on Trustees, 97. Although a resulting trust may be established by parol

evidence, yet to have that effect it must be clear and positive. 'To make such an effort successful, the law for the safety of titles, requires that the proof shall be of the most convincing and satisfactory kind. Nothing short of certain, definite and convincing proof will justify the court in divesting one man of his title to lands, evidenced by a regular deed, and putting it in another.' *Midmer* v. *Midmer,* 26 N. J. Eq. 304; *Boyd* v. *McLean,* 1 Johns. Ch. 590; *Lench* v. *Lench,* 10 Vesey, 517. Moreover, the *onus* of establishing a resulting trust rests upon him who seeks its enforcement, and, before a court of equity will be warranted in making a decree therefor, the evidence must be clear, definite and free from doubt. Hence, to entitle the plaintiff to conveyances of the premises in controversy to himself, he must fairly establish, if he paid for the property and took title in the name of his wife, that at that time it was mutually understood and was the intention that she should hold the title to the premises, not in her own right, but in trust for him."

This has been held ever since to be a correct exposition of law, except as to some remarks of the court in regard to the modicum of evidence required to establish such a resulting trust.

In *Coe* v. *Coe,* 75 Or. 145, 158 (145 Pac. 674), after quoting a portion of Mr. Justice Lord's opinion, it is said:

"In the language thus quoted, what is said about the evidence necessary to establish a resulting trust being 'free from doubt' is a degree of proof not required in civil cases."

1. So, we take it, that the true rule is, to establish a resulting trust in cases of this kind, there must be clear and satisfactory testimony indicating an intention on the part of the purchaser that the nominal grantee shall hold the property in trust and a like

intention on the part of the grantee to so hold, and
that this should be established, not by mere conjec-
tural testimony, but by such as is clear and satisfac-
tory and not necessarily such as to leave the question
"free from any reasonable doubt" as intimated by
the trial court in its opinion on this case. It, therefore,
remains for us to consider the testimony in this case,
first, as to who paid the consideration. As before re-
marked, the parties were married in 1888, and there is
some evidence tending to show that at that time the
plaintiff was a thrifty and prosperous business man,
but no evidence indicating that the deceased was at the
time of marriage possessed of any appreciable amount
of property or money.

The testimony of the plaintiff, who was a man of
seventy-three years of age, is that he bought the prop-
erty, paying for it with his own money, in connection
with a friend of his, Cord Sengstake, the original
purchase comprising a lot or block, or part of a block
100x100 feet, the money being actually paid by plain-
tiff and the deed taken in the name of Kate M. Nep-
pach, plaintiff's wife. The intention was that Sengs-
take and Neppach were to build on the property, and
in the course of the division Neppach chose the corner
one-half of the property 50x100 feet at $5,500 and
Sengstake took the inside portion of the property
paying $4,500 for it, and the deed was executed by
Neppach and his wife to Mrs. Sengstake for that part
of the property. Plaintiff then proceeded to build a
house, furnishing and paying his money therefor,
which was the mutual home of plaintiff and the de-
ceased Mrs. Neppach until her death in April, 1924.
Neppach testified, positively, that he paid the whole
consideration out of his own funds and it was not
disputed, but thoroughly established, that he has since

paid all the taxes upon the property, and that he built the house on the property paying for it out of his own funds, so, there is no contention on the part of anybody that Mrs. Neppach ever paid anything for the property excepting the original purchase price, which amounted to $5,500 net. Plaintiff testified that all the money so paid was his money and that his wife never paid a dollar on the purchase price. His testimony is corroborated in that respect, by the testimony of Mrs. Nellie Shipherd, an intimate friend of Mrs. Neppach, who testified that Mrs. Neppach told her that the property belonged to Mr. Neppach. Another disinterested witness, Mr. R. Thomas, testified to similar declarations on the part of Mrs. Neppach. Evidence of these declarations coming from an entirely disinterested source is entitled to all the credit that such declarations are ever entitled to, and go far to confirm the statement of the plaintiff. On the other hand, the only witness who professes to have any knowledge of the facts from an original source is the executrix of the will, herself an interested party, who testified to declarations of Mrs. Neppach that she had put $5,500 in the property. She says this was frequently repeated, but it is not shown that at the time of this purchase Mrs. Neppach had any such amount of money, or that it is probable that she should have had it. Her father was a merchant and banker in fairly good circumstances, probably worth $60,000, and was quite liberal with his children, four in number, for a man of his means. There is no source shown from which Mrs. Neppach could have had $5,500 at the time this purchase was made in 1908, except that she had accepted occasional presents from her father. It does not appear that she received anything of material value

from her father's estate, he having died in 1904, leaving his property exclusively to his wife, who continued to be the owner of it until 1914, when she divided it amongst the children, Mrs. Neppach receiving about $3,000, to which trifling sums seem to have been added from time to time from the rents of some real property. There is no sufficient testimony to show that Mrs. Neppach had the means at any time to have made this purchase with her own money. So, taking all the evidence together, there seems to be little doubt as to plaintiff's testimony, that he paid for the place as well as the improvements thereon, being a correct statement. This coupled with the evidence of Mrs. Shipherd and Mr. Thomas would seem to establish the fact of the purchase of the property and the understanding of the plaintiff and his wife in regard to it almost beyond a reasonable doubt if such an amount of evidence is required. It was a natural arrangement under the circumstances. The plaintiff was in very prosperous circumstances; had just a short time before become possessed of $50,000 in a single lump and had the means to buy the property and pay for it. He was not in good health and was very much oppressed by a multitude of his business cares, and it would seem to have been the proper and natural thing for him to have taken the property in the name of his wife with the understanding, which he claims to have had, and which, if we accept the disinterested testimony of Mrs. Shipherd and Mr. Thomas, was actually agreed to. Taking these circumstances as fully established here, they constitute all the elements of a resulting trust,—the payment of the money by the plaintiff, the agreement between him and his wife that the property should be taken in his wife's name to be held in trust

for him and to maintain all the property for him on that agreement, and the building of extensive improvements upon it, all of which are sufficient, if established, to meet every requirement of the decisions of our court.

2, 3. It is true that the *prima facie* presumption, where a man buys property and takes title in the name of his wife, is that such a purchase is intended as an advancement and the burden of proof is upon him to overcome that presumption by satisfactory evidence that such was not the intention of the parties. We think that presumption has been overcome in this case. The learned judge in the court below placed some emphasis upon the view that a resulting trust of this character must be established beyond a reasonable doubt, but as said in *Coe* v. *Coe, supra,* such is not the rule in this state. Nor do we attach controlling importance to the fact that the deceased devised the fee in the property to Miss Norval. It may have appeared to Mrs. Neppach that in view of her husband's advanced age, the substance of the understanding between herself and her husband would be kept by leaving the life estate in the property to him with reversion to her niece and this view, while it may have satisfied her conscience morally, is not sufficient to satisfy the demands of the law. There is in fact in the terms of the will itself some recognition of the rights of her husband. The will does not in terms recite that she is attempting to devise "my property," but "our home," indicating some indistinct recognition of her husband's rights therein and an attempt to recognize them and at the same time to limit them in favor of a relative in obedience to the natural instinct, which has crystallized in the saying that "blood is thicker than water." It would be a

great wrong and a legal fraud to hold that this property, bought with plaintiff's money and improved and maintained by him for many years, should be diverted to the use of a stranger, leaving him in his declining years to a mere occupancy of what he has bought and paid for. The decree of the lower court is reversed and a decree will be entered in favor of plaintiff.    REVERSED AND DECREE ENTERED.

BEAN, BROWN and BELT, JJ., concur.

---

Rehearing denied January 5, 1926.

ON PETITION FOR REHEARING.

(242 Pac. 605.)

For the motion, *Mr. James P. Stapleton.*

*Contra, Mr. Guy C. H. Corliss* and *Mr. Thomas Mannix.*

McBRIDE, C. J.—In a petition for rehearing, which is apparently studiously designed to be offensive rather than to discuss calmly the matter in hand, counsel begins by charging the court with making a misstatement as to the character and quality of this suit, in that the court used this language:

"This is a suit to declare a resulting trust in certain lots situated in the City of Portland."

4, 5. It does not require any lengthened argument to show that the complaint either was directed to a resulting or constructive trust, or that it had no object whatever. Our statute requires the evidence of an express trust to be in writing. In view of this

statute, no sane lawyer would attempt to enforce an express trust without alleging that the trust was in writing. In this state an express trust is one created by contract of the parties intentionally and in writing. Every other trust is either constructive or resulting. There was no demurrer to the complaint in this case, but counsel demurred to the evidence objecting that the alleged trust or declaration of trust was not in writing, which raised the question of an express trust at once. The plaintiff either had a cause of suit for a resulting or constructive trust or he had no cause of suit whatever, and all of the testimony offered by him should in that case have been excluded. The court allowed it to go in subject to the objections but finally overruled all objections and discussed the matter upon its merits. It is not true that an agreement or understanding between the parties will absolutely destroy the trust if equity can say that it would be fraud on the *cestui que trust* to allow the grantee of the legal title to retain possession of the property.

In *Robinson* v. *Leflore,* 59 Miss. 148, it was said:

"If the facts make out a case of resulting trust independently of the agreement, relief will not be denied because of the agreement; it being well settled that an invalid agreement cannot destroy an otherwise good cause of action, and this is no less true of resulting trusts than of other legal rights."

In *Jackson* v. *Jackson,* 150 Ga. 544 (104 S. E. 236), the court quotes with approval in *Brennaman* v. *Schell,* 212 Ill. 356 (72 N. E. 412) as follows:

"A resulting trust arising by operation of law is not defeated because the grantee verbally agreed to convey the title to the *cestui que trust* upon request."

In *Jackson* v. *Jackson, supra,* the court uses this language:

"Where A. pays the purchase money and causes the deed to be made to his wife, and an oral agreement to hold in trust for A. is shown to rebut the presumption of gift, the majority view is that the trust is nevertheless resulting if the oral agreement is not different from the agreement which would be implied if the grantee were legally a stranger to A. *Smithsonian Institution* v. *Meech,* 169 U. S. 398 (42 L. Ed. 739, 18 Sup. Ct. Rep. 396, see, also, Rose's U. S. Notes); *Harden* v. *Darwin,* 66 Ala. 55; *Milner* v. *Freeman,* 40 Ark. 62; *Harbour* v. *Harbour,* 103 Ark. 273 (146 S. W. 867); *Corr's Appeal,* 62 Conn. 403 (26 Atl. 478); *Sherman* v. *Sherman,* 20 App. D. C. 330; *Dorman* v. *Dorman,* 187 Ill. 154 (58 N. E. 235, 79 Am. St. Rep. 210); *Bachseits* v. *Leichtweis,* 256 Ill. 357 (100 N. E. 197); *Cooley* v. *Cooley,* 172 Mass. 476 (52 N. E. 631) (*semble*); *Howe* v. *Howe,* 199 Mass. 598 (85 N. E. 945, 127 Am. St. Rep. 516) (*semble*); *Sherwood* v. *Davis,* 168 Mich. 398 (134 N. W. 463) (*semble*); *Price* v. *Kane,* 112 Mo. 412 (20 S. W. 609); *Curd* v. *Brown,* 148 Mo. 82 (49 S. W. 990) (*semble*); *Bartlett* v. *Bartlett,* 15 Neb. 593 (19 N. E. 691); *Bailey* v. *Dobbins,* 67 Neb. 548 (93 N. W. 687); *Lahey* v. *Broderick,* 72 N. H. 180 (55 Atl. 354); *Duvale* v. *Duvale,* 54 N. J. Eq. 581 (35 Atl. 750); *McGee* v. *McGee,* 81 N. J. Eq. 190 (86 Atl. 406) (*semble*); *Yetman* v. *Hedgeman,* 82 N. J. Eq. 221 (88 Atl. 206); *Livingston* v. *Livingston,* 2 Johns. Ch. (N. Y.) 537; *Jackson* v. *Matsdorf,* 11 Johns. (N. Y.) 91 (6 Am. Dec. 355); but see *Binkowski* v. *Moskiewitz,* 144 App. Div. 161 (128 N. Y. Supp. 803); *Gould* v. *Gould,* 51 Hun, 9 (3 N. Y. Supp. 608); *Jeremiah* v. *Pitcher,* 26 App. Div. 402, (49 N. Y. Supp. 788), affirmed 163 N. Y. 574 (57 N. E. 1113); *Short* v. *Short,* 62 Or. 118 (123 Pac. 388); *Hickson* v. *Culbert,* 19 S. D. 207 (102 N. W. 774); *Shepherd* v. *White,* 10 Tex. 72 (*semble*); *Bickford* v. *Bickford,* 68 Vt. 525 (35 Atl. 471); *Walston* v. *Smith,* 70 Vt. 19 (39 Atl. 252) (*semble*); cf. *Borrow*

v. *Borrow*, 34 Wash. 684 (76 Pac. 305); *Collinson* v. *Collinson*, 3 De Gex, M. & G. 409; *Seawin* v. *Seawin*, 1 Y. & C. C. C. 65; *Williams* v. *Williams*, 32 Beav. 370 (*semble*); *Re Gooch*, 62 L. T., N. S. 384 (*semble*); *Devoy* v. *Devoy*, 3 Sm. & G. 403 (*semble*)."

Other cases to the same effect might be cited, as well as a few cases to the contrary, but these are deemed sufficient. So we feel, briefly stated, that we have not misnamed or misstated the cause of suit; nor, upon the trial, was the defendant's counsel so dumbfounded by the fact that a resulting trust is claimed as he now assumes.

Upon page 57 of the transcript of testimony we find the following:

"Mr. Stapleton [addressing the court]: Well, of course, I don't know how you want this presented, or the way you want it presented, but the way you do want it presented is the way we will have to present it. My idea of it now would be to discuss whether or not, a *prima facie* case of a resulting trust had been made out, as a matter of law."

Although counsel now says that no one until now seriously and sincerely urged that there was any evidence of a resulting trust, the sufficiency of the evidence on that point was the very first thing he proposed to discuss in the court below, and the court's opinion, which accompanies the transcript, shows that he decided the case upon the theory that it was a case where the plaintiff was endeavoring to establish a resulting trust and decided against the plaintiff, not upon the theory that he had not produced any evidence of a resulting trust, but that he had not proved it beyond a reasonable doubt. So, it appears that upon the trial nobody was deceived as to what the plaintiff was claiming, or as to what was the nature of the suit. So much for the matter of

misstatement. The object of the suit was correctly
stated and counsel knows it.

6. Counsel cites Perry on Trusts to the effect that
a resulting trust can never arise from any contract
of agreement of the parties. While this is true in a
general way, the language used is broader than the
law warrants, because no resulting trust ever arose
where there was an intent that the party in whose
name the property was taken should hold it as his
own and evidence, therefore, of the agreement of the
parties of all the circumstances of the case is ad-
missible to show that the party paying the money
was to be the ultimate owner of the property, and
that in the taking of the deed he was merely an inter-
mediary.

7. While counsel is quoting from Perry on Trusts,
it would be well to consider note (a) to Section 124,
last edition, and the authorities there cited.

"Nor will proof of a parol trust which is unenforce-
able because of the statute of frauds and which the
title holder declines to recognize prevent a trust from
resulting unless the agreement has the effect of show-
ing that the intention of the purchaser was that the
beneficial interest should pass to the grantee of the
legal title; and the fact that the enforcement of a re-
sulting trust amounts to substantially the same thing
as enforcing the express parol trust, which is void
under the statute of frauds is no objection."

This note is the law.

8. Counsel challenges the statement in which we
say that there is evidence corroborating the state-
ment of Mr. Neppach that he paid the money, and
like Ajax defying the lightning, he defies the court
to point to any such testimony. We only alluded
briefly to this testimony, but it seems proper now to

call counsel's attention to the additional testimony of Mrs. Shipherd not noticed in the original opinion.

"That evening after dinner, they [speaking of Mr. and Mrs. Neppach] told us about buying this property,—that Mr. Neppach had just bought a piece of property to build them a new home."

Not that Mrs. Neppach had bought it, or both of them had bought it, but that Mr. Neppach had bought it.

And again, on another occasion, Mrs. Shipherd relates this conversation with Mrs. Neppach:

"We were discussing homes, and I told how badly I felt to give up my home in Portland, and she said how glad they would be to have a home again, and that Mr. Neppach had just bought a piece of property on Twenty-fifth and Northrup to build them a home."

And again, on page 50 of the transcript of testimony, on another occasion, she relates, that when her husband and Mr. Neppach were playing cards she and Mrs. Neppach had this conversation:

"We were talking about the home and I said, 'How nice that you own a home all by yourself'; and she said, 'The property belongs to Mr. Neppach.'"

Further on, relating to the same conversation, Mrs. Shipherd used this language:

"She said that the property had been placed in her name in trust owing to his illness of diabetes and some lawsuit—I don't remember what."

So, if this testimony, by an absolutely disinterested witness, does not corroborate Mr. Neppach, it would be hard to find testimony that would corroborate these statements. The witness, Thomas, gave this

testimony, found on page 53 of the transcript of testimony:

"We was talking about Mr. Neppach's health; he was in poor health and just in the conversation, Mrs. Neppach was stating his conditions and all about it, and then the conversation just went off onto their home, and about Mr. Neppach having so many irons in the fire, and she wished he could sell off that saw-mill to get that off his hands. Then we got to talking about the home, and she says, 'Mr. Neppach,' she says, or 'We went out and picked our lot out, and this home where we are now, we built that,' she says, 'We had that lot there,' she says, 'and Mr. Neppach had that built just exactly the way I wanted it,' and she was so taken and wrapped up in the home that she had an awful lot to say about it; and then they commenced talking about the conditions of Mr. Neppach's health again, and she said, before it was wound up, she said that Mr. Neppach—that she was holding but very little property in her name, but she did hold that home, that Mr. Neppach had made it over to her under the conditions for his own bene-fit, as he was so much in business and his health absolutely was so impaired, and I think that was just about what she stated."

Further on, in answer to a question by the court, the witness said:

"I said Mr. Neppach was in awful bad health, and this here deed was made for the protection of Mr. Neppach on account of his health and his business ability; they was really looking for him to have abso-lutely a nervous breakdown.

"The Court: For his protection.

"A. For his protection; that's what she said; that is the first I ever heard of it."

So, it appears there is some corroboration and strong corroboration of Mr. Neppach's testimony. Of course it is easy for counsel to assume that witnesses

who do not agree with him are liars, but all the circumstances tend to sustain Neppach's theory. There is no question that plaintiff physically paid over the money to Goldsmith. Whether he got it from his wife, or whether it was his own money, is one of the principal questions here at issue, but he had it and paid it over and probably paid the whole purchase price of the two lots so far as actual payment of the money is concerned. That the original purchase was in the nature of some sort of a trust, at least, partially, cannot be denied.

9. Neppach and Sengstake bargained for the property together and the deed to the whole or the two lots was made to Mrs. Neppach, so it is evident that the intent was not that she should hold the whole property as her own, although there is just as much reason for counsel claiming that as there is that the intent was for her to hold Mr. Neppach's share of it as her own. Equitably, the purchasers were tenants in common and Mrs. Neppach their common trustee. That she recognized the trust by deeding half of the property upon request to Mr. and Mrs. Sengstake is conceded. She was the holder of the whole title for the benefit of herself and Sengstake or for Sengstake and Anthony Neppach, which later we held to be established in this case. The division of the property took place afterwards. Of course, if it had been the intent that Mrs. Neppach should be the owner of the property, even if Mr. Neppach appears to have paid for a one-half interest in the property, that intent would have had the effect to bar this suit, but we do not think the testimony so indicates and she was under as much obligation to hold Neppach's interest for him as she was to hold Sengstake's interest for him.

Counsel, for some unexplained reason, has joined
to his petition an exhibit, being Mrs. Neppach's ac-
count with the United States National Bank.   He
says it has no business here and was merely put in
to show that Neppach is a liar and unworthy of be-
lief.   But, if it was competent for any purpose at
all, we wonder why it was not introduced at the
trial.

Counsel claims that Mrs. Neppach paid $5,000 in
cash for this property in the first instance and $500
to Sengstake later.   If she did business by check and
if this exhibit could be considered for that purpose,
it would have shown these transactions, but no such
amounts appear by any check drawn by her.   It ap-
pears that about March 16th she checked out $3,000
for some purpose, and that about June 5th of the
same year the same amount was deposited to her
credit and that numerous other sums were checked
out or deposited from time to time.   But it does not
appear, in going over these amounts, that she had
at the time of this transaction a sufficient amount of
money on deposit to have made the payment of $5,500.
There was ample reason why counsel did not go into
the matter on the trial of the case.   He says he did
it to show that Neppach lied when he said he did not
know whether she had any money or not.   Neppach
was very rigidly cross-examined and being an elderly
gentleman, possibly smarting under the feeling that
he had been unjustly dealt with, some of his answers
were rather peppery, but, taking his testimony all
together, he never testified that he did not know that
his wife had money of her own, but did testify that
he did not know of her getting sums of money from
her father.   In fact, he stated that it was frequent
for her to take his money, or for him to give her

money, as he considered it just as safe in her hands as in his. We cannot speak of the relations of these parties with respect to their business as to how confidential they were. The fact that since 1912 she had in her possession or control a will which attempted to reduce his estate in that property from ownership to a mere life tenancy, and, so far as appears, without consultation with him in any way, would indicate that however confidential he may have been in his relations with respect to her, her relations with him were not entirely confidential, and that he really did not know how much money she had, or, having plenty himself, did not care how much she had or what she did with it. It is far from an impeachment of his integrity. The fact that he testified that in 1908 he considered himself worth $200,000, while the tax-roll showed his property to be of comparatively small value, is also referred to. Whether he ever made any return to the assessor does not appear. Whether the assessor appraised this property or that of the Nicolai-Neppach Company, or whether it was all situated in Multnomah County or elsewhere, does not appear. It is a matter of common knowledge that the average Portland business man does not boast about his wealth to the assessor. It is a very small peg upon which to hang a charge of perjury. We have the testimony very clearly that about the time he had received $50,000 in cash, he was financing Shipherd in his springs project to the extent of thousands of dollars; that he was able to build a house on the property and pay for it to the extent of several thousand dollars; was able to build a stone wall around it and pay for it; and that he had certainly enough money to spare to have made this purchase.

10. We believe the affirmative evidence, with the exception of the testimony of Mrs. Norval, an interested party, is all one way. In our opinion, he not only purchased the property with his own money, but with the intention, known to Mrs. Neppach, to spend a large amount of money in building a home on the property and having done this, it would be a gross fraud to allow it to be taken from him and his interest in it reduced to what will probably be a very brief life estate.

Counsel seems to intimate that the court was probably misled by their sympathies with the plaintiff on account of his age. So far as the writer of this opinion is concerned, he is not disposed to weep tears of sympathy over a man who admits being worth $200,000 and having forty or fifty thousand dollars worth of bonds in the bank. No sympathy seems to be needed as far as he is concerned. The other parties may be equally well off for all we know. There is no sympathy required. It is a matter of applying the law to the facts as we view them.

11, 12. Counsel complains that the court has ignored his contention that the title to the property in question has vested in Florence Norval. It is so apparent that the legal, not equitable, title to the premises vested in Mrs. Neppach and that by her will the legal, not equitable, title thereto vested in Anthony Neppach for life with a vested legal remainder in fee in Florence Norval, that notice of the contention was not deemed necessary, but the corollary which counsel seeks to draw from this elementary legal proposition is a *non sequitur*. Counsel's proposition is substantially this: By the terms of the will Florence Norval was devised a vested remainder in the property and had no knowledge of any equities

or supposed equities of Mr. Neppach therein.   There-
fore, she is an innocent purchaser for value.   How a
devisee under a will can ever be an innocent pur-
chaser is not explained.   A devisee takes the estate
subject to all equities, latent or patent, which existed
between the holder of the legal title and the person
who paid the purchase money.

13–16. It is also complained that the court has
ignored the fact of Mrs. Neppach having made a will
devising this property as evidence that she in good
faith believed it was hers.   This fact was not ignored
in the opinion, but such fact was not and is not con-
trolling.   She probably reasoned, as counsel does, that
if adverse business conditions overtook her husband,
he would still have a home which might be swept
away if he held the legal title, or she might justly
have reasoned that he was already well-to-do and had
no use for the property except for a home during his
life and allowed her affection for her own relatives
to so influence her conduct that she saw no moral
wrong in disposing of the ultimate title in the manner
shown in the will.   Holding as we do that the estate
vested in her in trust for her husband, whatever
motive induced her to ignore the trust, the act must
be held to have been a constructive fraud.   The fact
that the deed was taken in the name of the wife in-
stead of some other person, while important, is not
controlling.   If A. purchases property and takes the
title in the name of B. the law raises a presumption
of fact, *prima facie,* that the purchase was for A.'s
benefit.   If A. purchases property with his own funds
and takes the title in the name of his wife, the law
raises a presumption of fact, *prima facie,* that in so
taking the title he intended to make a gift or ad-
vancement to her, and he is required to overcome that

presumption by satisfactory evidence. This we think he has done.

In view of the request of counsel for an examination of the case by all of the justices, the decision has been delayed longer than usual. The case was carefully examined and considered in the first instance and has received a thorough re-examination upon counsel's petition for rehearing with the result that the court is more firmly than ever convinced that the original opinion was correct.

The petition for rehearing is denied.

REHEARING DENIED.

BEAN, BROWN and BELT, JJ., concur.